# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
FLEMING, HAYES, and POND
Appellate Military Judges

**UNITED STATES, Appellee**
**V.**
**First Lieutenant ADALBERTO BRINKMAN-CORONEL**
**United States Army, Appellant**

ARMY 20220225

Headquarters, 25th Infantry Division and U.S. Army Hawaii
Michael E. Korte, Military Judge
Colonel Marvin J. McBurrows, Staff Judge Advocate

For Appellant: William E. Cassara, Esquire (argued); Captain Justin L. Watkins, JA; William E. Cassara, Esquire (on brief and reply brief).

For Appellee: Captain Anthony J. Scarpati, JA (argued); Colonel Christopher B. Burgess, JA; Lieutenant Colonel Jacqueline J. DeGaine, JA; Major Chase C. Cleveland, JA; Lieutenant Colonel Matthew T. Grady, JA (on brief)

22 March 2024

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FLEMING, Senior Judge:

Appellant asserts four errors before this Court, two of which merit discussion but ultimately no relief.[1] We find the military judge did not abuse his discretion when he did not disqualify himself from presiding over appellant's court-martial. Nor did the military judge abuse his discretion when he denied appellant's motion to suppress evidence discovered from a search of appellant's phone. We affirm the findings and sentence in our decretal paragraph.

---

[1] We have given full and fair consideration to the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find they also merit brief discussion but ultimately no relief.

## BACKGROUND

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of attempted sexual assault of a child who has attained the age of twelve years, attempted sexual abuse of a child, absence from place of duty, communication indecent language, two specifications of wrongful possession of child pornography, and three specifications of wrongful distribution of child pornography, in violation of Articles 80, 86, and 134 of the Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 880, 886, and 934.[2] The military judge sentenced appellant to be dismissed from the service and to be confined for nine years and ten days.[3]

Appellant was stationed in Hawaii and was pending a potential administrative separation from the service for alleged cocaine use. In preparation for the pending administrative separation, appellant's husband, ███, a former servicemember with twelve years of service, had already relocated to Michigan to prepare for their life after the Army. During this separation from his spouse, appellant was arrested for attempted sexual offenses with a child. Appellant's criminal activity was discovered

---

[2] Contrary to what happened on the record, the Statement of Trial Results ("STR") states that a "not guilty" finding was entered for Specification 2 of Charge II. Appellant was found guilty, but the military judge merged Specification 2 with Specification 1 for sentencing, as laid out in note 3. Additionally, the STR states that Specification 3 of Charge II was "[d]ismissed after merger with other findings" when in fact the military judge sentenced appellant for that offense, see note 3. We amend the Statement of Trial Results, as incorporated into the Judgment of the Court, to correct these errors. *See* Rule for Courts-Martial 1111(c)(2); *United States v. Pennington*, ARMY 20190605, 2021 CCA LEXIS 101, at *5 (Army Ct. Crim. App. 3 Mar. 2021) (summ. disp.) ("Exercising our authority under R.C.M. 1111(c)(2), we note and correct the following issues in appellant's post-trial documents . . . .").

[3] The military judge acquitted appellant of a third attempted sexual offense with a child and merged the remaining two Article 80 convictions for sentencing. The military judge sentenced appellant to be confined for 60 months for those violations. The military judge also merged the two convictions for possession of child pornography for sentencing, and sentenced appellant to be confined for 9 months for those offenses. The military judge sentenced appellant to be confined for 13 months for each of the three distribution of child pornography convictions. Finally, the military judge sentenced appellant to be confined for 8 days for the communication of indecent language and 2 days for the absence. As the sentences to confinement were ordered to run consecutively, the total punishment adjudged was 9 years and 10 days and a dismissal.

by law enforcement officers participating in Operation Keiki Shield, a task force targeting crimes against children in Hawaii.[4]

Appellant was caught communicating through the Grindr messaging application with a Criminal Investigation Division (CID) Special Agent (SA), whom appellant believed was a fourteen-year-old boy named "Skyler." Upon being informed by "Skyler" that "Skyler" was only 14, appellant initially blocked, but then unblocked, "Skyler's" Grindr profile to erase their previous chat. Appellant initially told "Skyler" that "Skyler" really was not supposed to be on Grindr but appellant then proceeded to discuss sexual acts with "Skyler" and made plans to meet him that day for anal sex. On 4 April 2021, appellant was arrested by CID agents when he arrived at the predetermined location to meet "Skyler."

During his arrest, appellant was informed that he was suspected of attempted sexual assault with a child, indecent language, and possession or distribution of child pornography. Appellant was advised of his Article 31(b), UCMJ rights and declined to give a statement. A military magistrate also denied CID's verbal request to search appellant's phone, seized during his apprehension, for evidence of child pornography.[5]

After his arrest, appellant was released the same day to his company commander, Captain (CPT) ██. Appellant was "shaken" regarding his arrest and the alleged serious pending criminal offenses against him. Captain ██, who was concerned about appellant's well-being given his arrest and "shaken" reaction, ordered appellant to comply with unit sign-in requirements even though appellant was on leave in the local area. Appellant initially complied with the unit sign-in requirements, but when appellant failed to sign-in at 0600 on 6 April 2021 or respond to follow-up texts from his command, CPT ██ drove to appellant's on-base home.

Upon reaching appellant's home, CPT ██ did not observe appellant's vehicle and there was no response from inside the house. Captain ██ testified he was then

---

[4] Appellant challenged the military judge for cause after voir dire due to his previous role as the Special Victim Prosecutor (SVP) for Hawaii, which included providing advice to law enforcement agents executing Operation Keiki Shield. In the SVP role, the military judge also worked with and mentored the government counsel assigned to appellant's case. The military judge did not have any involvement with appellant's case, or any knowledge of it, until the case was referred to trial. When he was challenged for cause, he denied the challenge without further explanation other than to indicate he would speak with his supervisory judge about it. There is nothing further in the record regarding the request for recusal.

[5] Ultimately, a search authorization was granted for this phone.

concerned "something might be very, very wrong." Captain ▇ coordinated with military police and the base housing director about entering appellant's home to conduct an emergency search for appellant. Captain ▇ also called ▇ appellant's husband in Michigan, for consent to conduct a "health and welfare check" of appellant's home. ▇ provided CPT ▇ with consent to enter the home. Captain ▇ entered the house but did not find appellant. ▇ who was still on the phone with CPT ▇ became concerned and revealed previous disturbing text messages from, and conversations with, appellant.

▇ told CPT ▇ that appellant had sent ▇ a concerning message through Facebook Messenger the night of 4 April 2021. Appellant had sent ▇ a message instructing him to "come IMMEDIATELY back to Hawaii... book the next available flight as soon as you see this message... get to the house, look inside the green hoover, under the bag... You will find my phone there... The password is... Go to the images, there will be videos in the folder titled 'camera.'" Two hours later, appellant messaged ▇ again and told him "please disregard the previous messages. I had a crisis. I'm better now." Because of the time difference between Hawaii and Michigan, ▇ did not see the messages until he awoke on 5 April 2021. By the time ▇ was able to speak with appellant, appellant assured ▇ that appellant was fine and ▇ did not need to return to Hawaii.

After relaying these messages, ▇ directed CPT ▇ to go into the closet where the green hoover vacuum cleaner was located to look for appellant's phone. Captain ▇ did not find the phone in the vacuum cleaner, eventually left appellant's home, notified CID that appellant was missing, and requested CID's assistance in locating appellant. A few hours later, SA ▇ the CID agent overseeing the law enforcement search for appellant, called ▇ and asked him for consent to enter appellant's home again "to look for signs of life" and "to check for anything that might help us and assist... us locating" appellant. ▇ consented. Special Agent ▇ a CID agent at appellant's home, found the phone in the green hoover vacuum cleaner [hereinafter vacuum phone]. Special Agent ▇ testified she asked ▇ for "consent to seize and search the phone to locate anything that might help" and ▇ consented, saying "do whatever [you need] to do to find" appellant.

Special Agent ▇ testified the vacuum phone was unlocked when he found it and no password was required. Special Agent ▇ stated it was CID policy to coordinate with a CID Digital Forensic Examiner (DFE) prior to conducting a manual search of a seized phone but, after consulting with SA ▇, that policy was disregarded and an immediate manual search of the vacuum phone was conducted. Special Agent ▇ stated because CID was "looking for any signs of where [appellant] may have gone, including" any information from the videos, that the agents disregarded policy and went with "our gut[s], like our perspective was that we were going to [immediately] look through these videos to identify if [appellant] made an indication to where he was, where he may have gone that morning."

4

Special Agent ██ manually reviewed the videos at appellant's home. The videos depicted appellant saying goodbye to family members and expressing remorse for what he had done but did not indicate his location. Special Agent ██ testified he collected the vacuum phone, placed it in airplane mode, and drove it to the CID office for a digital forensic extraction later that day because that was the best way to search the phone and keep it "forensically sound." Special Agent ██ testified he did not "want to go through the depths of the phone to alter too much data," however, placing the vacuum phone in airplane mode blocked incoming and outgoing signals and stymied a possible method of determining appellant's current location.

The CID DFE, SA ██, was instructed by SA ██ to perform an extraction of the vacuum phone for "signs of life" to include recent activity, financial transactions, and the videos previously reviewed by SA ██. Special Agent ██ attempted to conduct a logical extraction as soon as he received the vacuum phone, but he ran "into issues with the particular" model and "actually obtaining the extraction" so it took approximately three hours after the phone was found. After the extraction, SA ██ filtered the data for the most recent activity and found the videos. The videos were dated soon after appellant's release from CID custody on the evening of 4 April 2021. While looking for and viewing these videos, SA ██ also saw a thumbnail image of what appeared to be a prepubescent male. He made a note of observing suspected child pornography but "continued to search the device because, again, the priority at that point was looking for signs of life."[6]

He then searched the vacuum phone for the most recent communication activity and discovered messages on the Telegram application that referenced sex with a child. He then looked at "USAA [banking] transactions," as SA ██ had been briefed that was the type of banking system used by appellant. Special Agent ██ did not conduct a Google search history or review other bank transactions. Appellant alleges in his *Grostefon* matters that viewing either his Google search history or other bank transactions would have pinpointed the hotel in which he was staying and expedited his safe return.

Special Agent ██ ended his search late in the evening with appellant still missing but with the intent of further reviewing the full extraction of the vacuum phone the following day in an attempt to locate appellant. Special agents continued to search numerous locations around Hawaii looking for appellant. The military judge found "CID searched far (locations all around Oahu), near (the home), and close (vacuum phone). They searched hospitals, beaches, and restaurants for signs of him to prevent the worse-case scenario." Ultimately, CPT ██ filed a missing

---

[6] On a later date, after appellant was located, CID sought and received a search authorization from a military magistrate to look for additional child pornography on the vacuum phone based on SA ██'s initial observation of suspected child pornography.

person report with the Honolulu Police Department at 2330 hours on April 6, 2021. The Honolulu Police Department found appellant in a hotel room less than 8 hours later, incoherent from an apparent overdose.[7]

## LAW AND DISCUSSION

### A. Disqualification of Military Judge

"An accused has a constitutional right to an impartial judge." *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001) (citations and internal quotation marks omitted). "An impartial and disinterested trial judge is the foundation on which the military justice system rests, and avoiding the appearance of impropriety is as important as avoiding impropriety itself." *United States v. Berman*, 28 M.J. 615, 616 (A.F.C.M.R. 1989). To ensure every military accused receives an impartial judge, the President promulgated Rule for Courts-Martial (R.C.M.) 902, which provides the framework for when a military judge must be disqualified from participating in a court-martial whether for actual bias or the appearance of bias.

Rule for Courts-Martial 902(a) addresses the appearance of bias, placing a duty upon a military judge to "disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." Appearance of bias is determined objectively. *Hasan v. Gross*, 71 M.J. 416, 418 (C.A.A.F. 2012).

Rule for Courts-Martial 902(b) outlines five specific circumstances in which a military judge is categorically disqualified from a proceeding for actual bias. The circumstances relevant to appellant's assignment of error are found in subsection (1), which mandates recusal when a military judge "has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding." R.C.M. 902(b)(1); see *Butcher*, 56 M.J. at 90 (noting R.C.M. 902(a) governs the appearance of bias while R.C.M. 902(b) governs specific disqualifying circumstances). A military judge may not accept waiver of any ground for challenge under R.C.M. 902(b). R.C.M. 902(e).

Disqualification for actual bias under R.C.M. 902(b)(1), "must be based upon extra-judicial, personal knowledge, not knowledge gained through performance of judicial duties." *United States v. Black*, 80 M.J. 570, 574 (Army. Ct. Crim. App. 2020) (cleaned up). "Personal means the bias or prejudice must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *Id.* (cleaned up); see *Litkey v. United States*, 510 U.S. 540, 549-551 (1994).

---

[7] DBC, CPT █, and CID SAs' concerns regarding appellant's safety were well-founded as he spent three weeks hospitalized for kidney failure after his overdose.

When a military judge's impartiality is challenged on appeal, "the test is whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt" by the military judge's actions. *United States v. Burton*, 52 M.J. 223, 226 (C.A.A.F. 2000) (cleaned up). When conducting this test, we apply an objective standard of "[a]ny conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned...." *United States v. Kincheloe*, 14 M.J. 40, 50 (C.M.A. 1982) (cleaned up). Allegations of partiality "must be supported by facts or 'some kind of probative evidence' which would warrant a reasonable inference of lack of impartiality on the judge's part." *Id.*

If we determine the military judge should have disqualified himself, we then analyze the facts to determine if the error was harmless. "In a plain error context we look to see if the error materially prejudiced the substantial rights of the appellant" pursuant to Article 59(a), UCMJ. *United States v. Martinez*, 70 M.J. 154, 159 (C.A.A.F. 2011). Even absent material prejudice to a substantial right pursuant to Article 59(a), UCMJ, a judge's failure to disqualify himself may still require a remedy after applying the test laid out in *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 862-864 (1988) for an appearance of bias.

In *Liljeberg*, the Supreme Court considered three factors in determining "whether a judgment should be vacated" based on a judge's appearance of partiality: "[1] the risk of injustice to the parties in the particular case, [2] the risk that the denial of relief will produce injustice in other cases, and [3] the risk of undermining the public's confidence in the judicial process." *Id.* at 864. The Court of Appeals for the Armed Forces (CAAF) applies the same three-part test in analyzing cases involving a military judge's appearance of partiality pursuant to R.C.M. 902(a). *See United States v. Quintanilla*, 56 M.J. 37, 80-81 (C.A.A.F. 2001).

The analysis for the third *Liljeberg* factor is "similar to the standard applied in the initial R.C.M. 902(a) analysis" in that we apply an objective standard and view the issue of disqualification through the eyes of a reasonable member of the public. *Martinez*, 70 M.J. at 159-60. However, the analysis of the third *Liljeberg* factor is much broader than the initial R.C.M. 902(a) analysis because "we do not limit our review to facts relevant to recusal, but rather review the entire proceedings, to include any post-trial proceeding, the convening authority action, [appellate proceedings], or other facts relevant to the *Liljeberg* test." *Id.* at 160. Put simply, courts consider the totality of the facts and circumstances surrounding the basis for disqualification to determine if a remedy is warranted. *See, e.g., United States v. Kish*, No. 201100404, 2014 CCA LEXIS 358 (N.M. Ct. Crim. App. 17 Jun. 2014) (considering both the military judge's actions during appellant's court-martial and the military judge's public comments made two weeks after appellant's trial as part of the analysis of *Liljeberg's* third factor); *see also Berman*, 28 M.J. at 618 ("What

7

happened on 4 December and after between [the military judge and the prosecuting attorney] is relevant to our assessment of their relationship prior to that date").

Here, we do not find that the military judge was disqualified from presiding over appellant's trial under R.C.M. 902(a) or (b). Appellant alleges no actual bias under R.C.M. 902(b), and we find none. As evidence of an appearance of partiality under R.C.M. 902(a), appellant points to the military judge's familiarity with and involvement in Operation Keiki Shield, his self-described expertise regarding sexual assault prosecutions, and his working relationship with government counsel.

While we give the military judge's ruling on the recusal motion little deference in that he failed to provide his rationale, we can surmise from his forthcoming responses during voir dire that it was not an abuse of his discretion to deny the recusal request. The military judge indicated the steps he had taken to shield himself from potential cases when his selection as a military judge was confirmed. While he advised law enforcement on Operation Keiki Shield when he was a Special Victim Prosecutor, it was in reference to specific cases. The military judge had no prior knowledge of appellant's case until it was referred to trial. While the military judge did express expertise regarding sexual assault crimes, that is true of many military judges, particularly those with recent litigation experience. Finally, while the military judge worked with the government trial counsel on previous cases, he was never in a supervisory relationship with them and expressed no favorable or unfavorable opinion of them.

Because we find no error in denying the recusal motion, we do not test for material prejudice or apply the *Liljeberg* test. We do, however, note that even under a *Liljeberg* totality of the circumstances analysis, there is nothing in the record to suggest an appearance of partiality by the trial judge such that public confidence in the system would be impacted if the case were affirmed.

### B.    Motion to Suppress

Appellant challenges the military judge's ruling denying the motion to suppress all evidence derived from the search of the vacuum phone after it was seized by CID. He argues CID exceeded the scope of ███'s qualified consent to search the phone to find appellant when they seized the phone and, hours later, conducted a limited logical extraction that concluded after the finding of child pornography while appellant was still missing. Further, to the extent CID was proceeding under an emergency search exception, appellant argues their failure to conduct the search in a good faith effort to render immediate medical aid, to obtain information to assist in rendering such aid, or to prevent immediate or ongoing personal injury invalidates that warrantless search. Appellant argues the actions taken by CID are far more indicative of a desire to find and preserve evidence of a crime.

8

A military judge's ruling on a motion to suppress is reviewed for an abuse of discretion, and the evidence is considered in the light most favorable to the party that prevailed at trial. *United States v. Mitchell*, 76 M.J. 413, 417 (C.A.A.F. 2017). An abuse of discretion occurs when:

> (1) the military judge predicates a ruling on findings of fact that are not supported by the evidence of record; (2) the military judge uses incorrect legal principles; (3) the military judge applies correct legal principles to the facts in a way that is clearly unreasonable; or (4) the military judge fails to consider important facts.

*United States v. Lattin*, 83 M.J. 192, 198 (C.A.A.F. 2023) (quoting *United States v. Rudometkin*, 82 M.J. 396, 401 (C.A.A.F. 2022) (internal citations omitted)).

"An abuse of discretion must be 'more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. Black*, 82 M.J. 447, 451 (C.A.A.F. 2022) (quoting *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013)).

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const., amend. IV. The President has implemented the Fourth Amendment through Military Rules of Evidence [Mil. R. Evid.] 311-317. *United States v. Hoffman*, 75 M.J. 120, 123 (C.A.A.F. 2016). Just as people have the right to be "secure in their persons, houses, papers and effects," pursuant to the Fourth Amendment, people also have a reasonable expectation of privacy in their cell phones. *United States v. Wicks*, 73 M.J. 93, 99 (C.A.A.F. 2014). Cell phones "may not be searched without probable cause and a warrant unless the search. . .falls within the one of the recognized exceptions to the warrant requirement." *Id.* Warrantless searches are presumptively unreasonable unless they fall under one of the several exceptions to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967).

## C.  Consent

### 1. Common authority

One "jealously and carefully drawn" exception to the warrant requirement "recognizes the validity of searches with the voluntary consent of an individual possessing authority." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citations omitted). "Voluntary consent to search may be obtained from the person whose property is to be searched or from a fellow occupant who shares common authority over the property." *United States v. Weston*, 67 M.J. 390, 392 (C.A.A.F. 2009) (citations omitted). Military Rule of Evidence 314(e)(2) provides "[a] person may

grant consent to search property when the person exercises control over that property." "'The validity of the third party consent does not hinge on niceties of property law or on legal technicalities' . . . but is instead determined by whether the third party has joint access or control of the property for most purposes." *Black*, 82 M.J. at 451 (quoting *United States v. Rader*, 65 M.J. 30, 32 (C.A.A.F. 2007)) (internal quotation marks and citation omitted). "A third party has authority to consent to a search when he possesses 'common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" *Rader*, 65 M.J. at 32 (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)).

In *Rader*, the Court of Appeals for the Armed Forces [CAAF] explained: common authority is the:

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit' the search.

*Id*. at 33 (quoting *Matlock*, 415 U.S. at 171, n.7).

The government bears the burden of proving by clear and convincing evidence "that a third party has joint access and control to the degree that such control confers a right to consent to search." *Black*, 82 M.J. at 451 (citing Mil. R. Evid. 314(e)(5)). The degree of control a third party possesses over property is a question of fact whereas whether that control is sufficient to establish common authority is a question of law. *Id*. (citing *Rader*, 65 M.J. at 33). Even if the third party purporting to give consent lacks actual authority to consent, the search may still be reasonable "if the facts known to the police when the purported consent is given 'would [warrant a man of reasonable caution to conclude]' that the consenting party had authority over the premises." *United States v. White*, 40 M.J. 257, 258-59 (C.M.A. 1994) (quoting *Terry v. Ohio, 392 U.S. 1, 21-22* (1968)).

In the present case, appellant gave ███ common authority over the vacuum phone by providing its unique hidden location, the password, and directing him to particular videos appellant wanted ███ to view. While appellant may have intended to revoke common authority over the vacuum phone with his "disregard" message, that was not clearly communicated to ███ nor did appellant take any steps to revoke common authority such as moving the phone from its unique hidden location within a green hoover vacuum located in the closet or changing the phone's password.

Regardless, CID reasonably relied on ███'s consent to search the vacuum phone, given ███s status as the husband of appellant, his knowledge of the exact location of the hidden phone inside the hoover vacuum cleaner, its password, and the videos he described being located on the phone. As such, it was reasonable for CID to rely on ███s consent to search the vacuum phone, subject to any limitations to the scope of his consent.

## 2. Scope of Consent

Military Rule of Evidence 314(e)(3) provides "[c]onsent may be limited in any way by the person granting consent, including limitations in terms of time, place, or property, and may be withdrawn at any time." The test for measuring the scope of consent is one of "objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "Even though that is a question of law, factual circumstances are highly relevant when determining what [a] reasonable person would have believed to be the outer bounds of the consent that was given." *United States v. Gallegos-Espinal*, 970 F.3d 586, 591 (5th Cir. 2020) (quotes and citations omitted). Determining the scope of a consent to search requires an evaluation of the totality of the circumstances "including the interaction between the parties, the purpose of the search, and the circumstantial evidence surrounding the search." *Black*, 82 M.J. at 459 (Sparks, J., dissenting) (quoting *United States v. Beckmann*, 786 F.3d 672, 679 (8th Cir. 2015)).

In the present case, the military judge found ███ placed no restrictions on CID's use of the vacuum phone. According to the testimony of ███ and multiple CID agents, ███ provided consent to search the vacuum phone to find his husband. Specifically, ███ stated "do whatever you need to do to find my husband." We analyze ███'s statement in two segmented parts.

First, the language "do whatever you need" places no restriction on the time, place, or manner that CID was authorized to search the vacuum phone. This segmented language supports the military judge's finding of fact that ███ placed "no restrictions" on CID's search of the vacuum phone. The language "to find my husband," however, places a condition on the scope of CID's search in that it must relate to the purpose of finding appellant. When we review the entirety of ███'s statement in this context, there is a restriction placed on the scope of the CID search of the vacuum phone: the method of search must relate to the purpose of finding appellant. As long as CID's search of the vacuum phone was related to the purpose of finding appellant, we agree with the military judge that ███ gave broad consent regarding the time, place, or manner of the CID search.

Appellant argues the CID agents' actions in searching the vacuum phone constituted subterfuge, in large part because there were allegedly more efficient

11

searches that could have been performed on appellant's vacuum phone with a greater likelihood of finding more useful and timely information regarding his location. While we agree with our colleague in the dissent that CID likely might have been able to conduct a more efficient search to locate a missing person, we instead are required to analyze the actual steps employed by CID to determine if the method of search was within the scope authorized by ██ and the related purpose of finding appellant.

We find SA ██ was actively attempting to find appellant, so much so, he and SA ██ deviated from CID policy when SA ██ manually reviewed the vacuum phone videos at appellant's home without prior coordination with a CID DFE. These agents followed their "gut" by disregarding CID policy hoping to more readily ascertain appellant's location with an immediate manual review of his phone. Despite SA ██ review of the videos, no information regarding appellant's location was revealed.

Special Agent ██ seized the vacuum phone and then drove it to the CID office for DFE examination. Special Agent ██'s act of placing the vacuum phone in airplane mode and driving it to the CID office for a DFE examination was not only consistent with his understanding of best CID practices at the time but also addressed his fear of altering potentially helpful recent activity usage data within the vacuum phone if he attempted any additional manual review. The agent's fear of altering recent data, which could locate appellant, provides a reasoned explanation as to his decision to drive the phone to the CID office to be immediately reviewed in a "forensically sound" manner by SA ██, a DFE, who was a trained expert in conducting searches on a cell phone.

A full digital forensic extraction of appellant's vacuum phone began as soon as SA ██ received the phone. Special Agent ██ experienced some technical issues with conducting an extraction on appellant's particular phone. As soon as the extraction was complete, SA ██ sorted the contents of appellant's vacuum phone to prioritize recent activity to filter out data unlikely to find appellant. He first filtered through the recent data to locate the videos viewed by SA ██ as that was "a starting point of . . the last known activity." While looking for recent activity in the preview or "table" view of the software, SA ██ saw an image of what appeared to be a prepubescent male. Special Agent ██ briefly noted the existence of possible child pornography, but he did not "continue to search into that" and instead continued searching appellant's phone for other recent activity in an attempt to ascertain appellant's current location.[8] SA ██ did not turn "off the lights and [go] home"

---

[8] Although the dissent references SA ██'s decision to go home late in the evening, after finding evidence of child pornography but prior to appellant ultimately being

(continued . . .)

after almost immediately observing suspected child pornography upon his first review of the phone and the four videos, as proffered by the dissent, but he instead continued to search the phone for recent activity as that was his "priority at [that] time."

Now on appeal, appellant and the dissent, may point to a different or allegedly better way to conduct a search for a missing person, such as not placing the phone in airplane mode and taking it to the CID office for a full extraction, but the method in which CID conducted the search comported with the scope of █████'s consent to find appellant. While the CID agents may have been better served deviating from prescribed 'best practices' of 'forensic preservation' and 'digital extraction' to more efficiently locate appellant, CID acted within their training to undertake efforts to locate appellant. In that light, the agents' acts are not "inexplicable" as the dissent would otherwise suggest. As noted by our superior court regarding cell phones and the employed method of search:

> when it comes to cell phones and computers, although one search method may be objectively "better" than another, a search method is not unreasonable simply because it is not optimal. Here, the examiner was not rummaging through Appellant's phone, even though the defense expert pointed to a different – and perhaps even better – way to conduct the search.

*United States v. Shields*, 83 M.J. 226, 232 (C.A.A.F. 2023).

We find the military judge did not abuse his discretion denying defense's motion to suppress evidence after finding CID possessed valid consent from █████ to search appellant's vacuum phone and the method of search was within the scope of █████'s authorization.[9]

---

found, we note SA █████ was not the lone CID agent involved in the search for appellant, and multiple CID agents were searching Hawaii to find appellant. Special Agent █████ also intended to continue his search the next day, but the superseding event of appellant being located negated the need for SA █████'s continued review. Special Agent █████ then ceased searching appellant's phone and waited for a magistrate authorization prior to taking any further action.

[9] As we find the military judge did not abuse his discretion denying appellant's motion to suppress evidence regarding █████'s consent to search the vacuum phone, the issue of whether CID's search was also proper under an emergency exception is mooted.

**CONCLUSION**

On consideration of the entire record the findings of guilty and the sentence are AFFIRMED.

Judge POND concurs.

HAYES, Judge, dissenting in part:

I agree with my colleagues and find the military judge did not abuse his discretion when he did not disqualify himself from presiding over appellant's court-martial. However, I would find the military judge abused his discretion when he denied appellant's motion to suppress evidence discovered from a search of appellant's phone. Law enforcement both (1) exceeded the scope of the consent to search the phone and (2) failed to conduct an emergency search in a good faith effort to respond to the purported emergency. Finding both prejudice and grounds to apply the exclusionary rule to deter law enforcement misconduct, I would affirm the findings of guilty of Charge I and Charge III and their specifications and would set aside and dismiss with prejudice the findings of guilty of Charge II and its specifications.

As the majority aptly noted, appellant's husband, ███ is a former servicemember with twelve years of service. At the time of the search in question, ███ had vacated the quarters he shared with appellant in Hawaii and relocated to Michigan with the expectation that appellant would join him there upon his separation from the Army. While in Michigan, ███ received a call from appellant's commander, CPT ███, who was concerned "something might be very, very wrong" because appellant had recently been arrested, had not signed in as required, and was not answering the door at his residence. Captain ███ asked ███ for his consent to enter the home and conduct a "health and welfare check" which ███ granted. Appellant could not be located.

Hours later, SA ███ called ███ again and asked him for consent to enter the home "to check for signs of life" and "anything that might help us... locating" appellant. ███ granted consent. When CID found the 'vacuum phone' they asked ███ for "consent to seize and search the phone *to locate anything that might help*." ███, who had previously received the disturbing messages from his husband as documented in the majority opinion, responded "do whatever [you need] to do *to find my husband*."

At this point, there should be no dispute that the *sole* purpose of the search of the phone, and the *sole* reason consent was provided to search it, was to find appellant – who was believed to be, and apparently was, in a life-threatening

situation. This was a search for a missing person, plain and simple. In that context, the following actions by CID are inexplicable:

(1) the seizing agent immediately put the phone in 'airplane mode' which prevented any outgoing or incoming calls or data;

(2) the seizing agent did not conduct any rudimentary searches of the phone beyond a review of the 'goodbye' videos already known to exist by ███ (for example, no attempt was made to discover recent searches or calls or messages);

(3) the seizing agent sent the phone for Digital Forensic Examination (DFE) in order to search it in the most "forensically sound" manner;

(4) the DFE agent discovered evidence of child pornography on the phone and reported that discovery prior to locking up the phone overnight, with appellant still missing. He did not document or report any findings that might have assisted in the search for appellant, who was found by local authorities hours later and hospitalized for an extended period.

The majority relies on *United States v. Shields,* 83 M.J. 226 (C.A.A.F. 2023) to justify these actions as suboptimal, but not unreasonable. *Shields* is distinguishable because it concerned the reasonableness of a search for criminal activity. Here, law enforcement officials were ostensibly searching for a missing person. *Any* search undertaken to find or preserve evidence of criminal activity, such as a forensic DFE, was unreasonable in this case unless its primary aim was to find appellant, as discussed below.

### A. Scope of Consent

The military judge found ███ placed no limitations on his consent to search the vacuum phone. This was clear error. According to the testimony of ███ and multiple law enforcement agents, ███ provided consent to search the vacuum phone *to find his husband.* Specifically, he stated "do whatever [you need] to do to find my husband." This is clearly a limitation. ███ was only authorizing law enforcement to search the phone for information that would assist them in finding his husband, given the exigent circumstances he believed existed as a result of the information being provided to him by those same law enforcement agents. Had appellant returned home after ███ granted consent but before law enforcement began their search, they would have had no authority to search the phone, because it would not have served to find appellant.

The military judge's failure to recognize this qualifying language as a limitation on the scope of the consent rendered his subsequent determination that law enforcement had consent to seize and search the phone flawed. For example, his

15

ruling made no mention of the fact the seizing agent did not conduct any rudimentary searches of the phone to discover recent searches or recent calls or messages, but instead seized the phone and sent it for digital forensic examination in order to search it in the most "forensically sound" manner. As a result, the phone remained in airplane mode and locked up overnight after the DFE agent found evidence of child pornography on the phone. It is hard to imagine any action by law enforcement that would have been more clearly outside the scope of the consent or more inconsistent with the goal of finding appellant. Given appellant was convicted of possessing the child pornography found on his phone, this clear error materially prejudiced appellant.

### B. Emergency search exception

An emergency search to save a life or for related purposes does not require probable cause. *See Mincey v. Arizona*, 437 U.S. 385, 392 (1978). Military Rule of Evidence 315(a) permits the admission of evidence obtained under exigent circumstances when relevant and not otherwise inadmissible under the Military Rules of Evidence or the Constitution. The emergency search exception appears in Mil. R. Evid. 314(i), which provides:

> Evidence obtained from emergency searches of persons or property conducted to save life, or for a related purpose, is admissible provided that the search was conducted in a good faith effort to render immediate medical aid, to obtain information that will assist in the rendering of such aid, or to prevent immediate or ongoing personal injury.

In determining whether emergency circumstances exist, the question is not whether in fact an actual emergency existed, but whether the police officer reasonably believed that one existed under the available facts and circumstances known at the time of entry. *United States v. Muniz*, 23 M.J. 201, 208 (C.M.A. 1987).

It was objectively reasonable to conduct an emergency search in this instance. Appellant was missing and law enforcement officials were aware that he had been arrested for serious crimes and had directed his spouse to videos in which he was saying goodbye to members of his family. Law enforcement had grounds to take all reasonable measures to find appellant. Had those measures resulted in the discovery of criminal misconduct, the evidence would have likely been admissible under the emergency search exception.

However, the text of Mil. R. Evid. 314(i) requires a good faith effort to render aid, obtain information that will assist in rendering aid, or to prevent immediate or ongoing personal injury. Similar to these law enforcement agents' actions when provided consent, their actions in the face of a life-threatening emergency belie any

intent to save appellant's life or prevent injury to his person. While the Honolulu police were jumping into action to locate appellant before he caused himself further harm, and indeed it would appear they prevented such harm, military law enforcement proceeded to: (1) deactivate the vacuum phone, one of the most helpful tools they had to find appellant; (2) seize that phone to keep it "forensically sound" as opposed to searching it immediately for clues as to appellant's whereabouts; and, (3) cease the DFE overnight after they discovered evidence of child pornography, and while appellant was still missing.

But for the actions of the Honolulu police in finding appellant before he killed himself, intentionally or otherwise, this case might never have come to trial. I fail to see *any* evidence of good faith on the part of military law enforcement personnel conducting the search of the phone to justify an emergency exception search. I also fail to see how the diligence of other law enforcement officials searching for appellant has any bearing on the scope or good faith of the search of appellant's phone. As such, I would find the military judge committed clear error by admitting the evidence that was obtained and relied on to convict appellant.

### C. Exclusionary Rule

A finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused. Article 59(a), UCMJ, 10 U.S.C. § 859(a). "Although the Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, the Supreme Court long ago created an exclusionary rule that forbids the use of improperly obtained evidence at trial." *United States v. Lattin*, 83 M.J. 192, 197 (C.A.A.F. 2023) (citing *Arizona v. Evans*, 514 U.S. 1, 10, (1995); *Weeks v. United States*, 232 U.S. 383, 398 (1914)) (cleaned up).

"Evidence derivative of an unlawful search, seizure, or interrogation is commonly referred to as the 'fruit of the poisonous tree' and is generally not admissible at trial." *United States v. Conklin*, 63 M.J. 333, 334 (C.A.A.F. 2006) (citing *Nardone v. United States*, 308 U.S. 338, 341 (1939)). "[T]his exclusionary rule is designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Lattin*, 83 M.J. at 197 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974) (quotation marks omitted)). The exclusionary rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009).

For the exclusionary rule to apply, "the deterrent effect of suppression must be substantial and outweigh any harm to the justice system." *Id.* at 147. In *Lattin*, the CAAF explained, "[i]n other words, if the government cannot use evidence that

the police obtained by violating the Fourth Amendment, the police will have an incentive not to violate the Fourth Amendment." 83 M.J. at 197.

The President codified the exclusionary rule in Mil. R. Evid. 311(a), which provides:

> Evidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity is inadmissible against the accused if:
>
> (1) the accused makes a timely motion to suppress or an objection to the evidence under this rule;
>
> (2) the accused had a reasonable expectation of privacy in the person, place, or property searched; the accused had a legitimate interest in the property or evidence seized when challenging a seizure, or the accused would otherwise have grounds to object to the search or seizure under the Constitution of the United States as applied to members of the Armed Forces; and
>
> (3) exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system.

Additionally, "[t]he prosecution has the burden of proving by a preponderance of the evidence . . . that the deterrence of future unlawful searches or seizures is not appreciable *or* such deterrence does not outweigh the costs to the justice system of excluding the evidence." Mil. R. Evid. 311(d)(5)(A) (emphasis added). The CAAF referred to the former as the "appreciable deterrence test" and the latter as the "balancing test." *Lattin*, 83 M.J. at 197. A military judge's assessment of these matters is reviewed for a clearly unreasonable exercise of discretion, which is a less deferential standard than clear error. *Id.* at 198. (citing *United States v. Rudometkin*, 82 M.J. 396, 401 (C.A.A.F. 2022)).

I would find a disturbing lack of good faith on the part of law enforcement in this case to (1) stay within the scope of the consent they were provided, or (2) to take action to save life or render immediate aid. To the contrary, what I have observed is a search that exceeded the scope of consent, and actions that were clearly inconsistent with any effort to save or aid appellant. The military judge found that the search was lawful, and the evidence admissible, under both theories. I disagree with both findings and, for the reasons already stated, would find the trial judge's reliance on clear errors made in his findings to be an abuse of his discretion

that materially prejudiced appellant. Because law enforcement acted with careless disregard of both the scope of the consent to search and the necessity to act in good faith in an emergency search, I would find it appropriate to employ the exclusionary rule in this case to deter police misconduct in the future.

Whether undertaken in an emergency for the purpose of saving a life, or undertaken with consent for the same purpose, the circumstances in this case demanded a departure from "best practices" and "forensic preservation" and "digital extraction." It is abundantly clear in this case that law enforcement recognized a golden opportunity to search for and find evidence upon which to base additional charges against appellant, who had recently been arrested for attempting to have sex with a minor. Having previously been denied an initial warrant to search appellant's other phone for evidence of child pornography, a warrant which was later granted, the DFE ▮ used the exigent circumstances of appellant's disappearance to search for evidence of additional crimes. Once he found that evidence, no other findings were documented or reported that evening. For all intents and purposes, he turned off the lights and went home – while appellant was still missing. Such action cannot be condoned and most certainly should not be rewarded.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court